**NOT FOR PUBLICATION**                                          **CLOSED**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **DEBBIE MILLIRON, individually and onbehalf of all others similarly situated,** | : <br> : <br> : <br> :    **Civil Action No. 08-4149 (JLL)** |
|         **Plaintiff,** | : <br> : |
|     **v.** | :    **OPINION AND ORDER** <br> : <br> : |
| **T-MOBILE USA, INC.** | : <br> : |
|       **Defendant.** | : <br> : |

**Linares,** District Judge.

This Court granted preliminary approval to the proposed settlement of this class-action lawsuit on February 19, 2009 (Docket Entry No. 17 (the "Preliminary Approval Order")), and set forth a timeline pursuant to which Class Counsel and T-Mobile (collectively, the "Settling Parties") could move for final approval of the "Settlement Agreement" (Docket Entry No. 12-2.) Pursuant to that schedule, the Court conducted a fairness hearing on July 27, 2009. Now, having considered the briefs and declarations filed by all parties to this matter, including objectors, the Court sets forth its findings below.

## I. Background

This class action involves a claim by Plaintiff Debbie Milliron ("Plaintiff" or "Milliron") that flat-rate early-termination fees ("ETFs") charged by T-Mobile violate, inter alia, the Federal Communications Act and various state consumer protection laws. (See generally Docket Entry No. 19 ("Am. Compl.").) ETFs constitute a fee of $200 charged to customers for cancellation of their wireless service "at any time after a trial period but before the end of the 'service plan' term, regardless of the reason(s) for cancellation." (Id. ¶ 3.) Milliron is a citizen of California

whose subscriber agreement with T-Mobile contained an ETF provision and who was ultimately charged an ETF.  (Id. ¶ 8.)

After undergoing a day-long mediation with the Honorable Douglas Wolfson (ret.), the parties to this matter reached a settlement with the following general terms: (1) a cash common fund of $11.5 million allowing for $125 payments to Class members who paid a flat-rate ETF and $25 payments to Class members who were charged, but did not pay, a flat-rate ETF[1]; (2) $2 million in non-cash relief in the form of bonus minutes, free text messages, and T-Mobile "Hot Spot" access; and (3) the ability for eligible Class members to modify their contract by converting flat-rate ETFs into pro-rated ETFs.  (See generally Settlement Agreement.)

On February 19, 2009, this Court preliminarily approved the settlement and preliminarily certified the settlement class ("Class").  The Class consists of two subclasses – (1) ETF-Assessed Class: All persons in the United States who were parties to a contract for a wireless telephone personal account and were billed a Flat-Rate ETF by T-Mobile and/or its legacy companies from July 23, 1999 until February 19, 2009.  The ETF-Assessed Class includes such persons whether or not they paid any portion of the ETF, whether to T-Mobile, any outside collection agency, or other third party to whom T-Mobile has assigned the rights to the ETF; and (2) Subscriber Class: All persons in the United States who were parties to a contract for a wireless telephone personal account with T-Mobile that included or includes a provision for a Flat-Rate ETF from July 23, 1999 until February 19, 2009, and who have not paid or been billed a Flat-Rate ETF. (Settlement Agreement, Art. II, ¶¶ 14, 42.)

Now, having considered the arguments and briefs in support of and in opposition to the preliminarily-approved settlement, and having conducted the fairness hearing required by Fed. R.

---

[1] In order to claim the $125 payment, Class members must be able to document payment of a flat-rate ETF.  Those Class members who certify under penalty of perjury that they paid the fee but cannot document it are entitled to receive $25.

Civ. P. 23(e)(2), the Court issues this Opinion to address the issues of: (1) Class Certification; (2) reasonableness of the settlement; (3) reasonableness of the requested attorney fee award; and (4) allocation of the attorney fee award.

## II.    Class Certification

Prior to addressing the specifics of the settlement, the Court analyzes the class certification factors promulgated by Fed. R. Civ. P. 23. Rule 23 has been held to permit classes certified only for settlement. In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55 F.3d 768, 777-78 (3d Cir. 1995). In order to be certified, the class must meet all of the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a)(1-4). It must also meet the additional requirements of Rule 23(b)(3): superiority and predominance. Fed. R. Civ. P. 23(b)(3).

### A.    Rule 23(a) Factors

#### 1.    Numerosity

Fed. R. Civ. P. 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." "The Third Circuit has generally held that the numerosity requirement is met if the proposed class exceeds 100 members." Welch v. Bd. of Dirs. of Wildwood Golf Club, 146 F.R.D. 131, 135 (W.D. Pa. 1993.) The Class includes millions of class members, dispersed nationwide. Thus, it is so numerous that joinder of all members is impracticable.

#### 2.    Commonality

All members of the Class seek to declare T-Mobile's flat-rate ETF an unenforceable penalty. "The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." Baby Neal ex rel. Kanter v. Casey, 43 F.3d 48, 56 (3d Cir. 1994). Here, the requirement is easily satisfied, as all Class members share a common question of law and seek relief on the same nucleus of operative

3

facts.

### 3.  Typicality

The typicality inquiry "assesses whether the named plaintiffs have incentives that align with those of absent class members so that the absentees' interest will be fairly represented." Danvers Motor Co., Inc. v. Ford Motor Co., 543 F.3d 141, 149-50 (3d Cir. 2008) (quoting Georgine v. Amchem Products, Inc., 83 F.3d 610, 632 (3d Cir. 1996)). Its purpose is to ensure that the interests of the class representatives do not diverge from those of the class as a whole. Baby Neal, 43 F.3d at 57. Here, the claims of the named plaintiff are typical of the Class claims because, like the Class, Milliron alleges that T-Mobile charged her a flat-rate ETF, which operates as an unenforceable penalty. Stated differently, her claim is based on the same legal theory and course of conduct as that of the absent members of the Class. Thus, Milliron's incentives line up with those of absent class members. This factor is accordingly satisfied.

### 4.  Adequacy

In order to certify a class, a court must also find that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "There are two factors: (1) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (2) the plaintiff must not have interests antagonistic to those of the class." In re Prudential Ins. Co. Sales Practice Litig., 962 F. Supp. 450, 519 (D.N.J. 1997). No objection has been lodged as to the qualifications and capabilities of Class Counsel, and the Court is aware of Class Counsel's expertise in handling complex civil litigation. In fact, many of the firms handling this matter on behalf of the Class have appeared before this Court on other class action-related litigation, and the Court is satisfied that they are well-equipped to handle a case of this size and complexity.

Additionally, no objections have been articulated as to the adequacy of representation of

4

the class representative. No defenses unique to the class representative have been raised, and the class representative does not have divergent interests from the Class as a whole. Thus, Milliron is capable of fairly and adequately protecting the interests of the Class in connection with the proposed settlement.

### B. Rule 23(b)(3) Factors

Pursuant to Fed. R. Civ. P. 23(b)(3), a Court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." In examining predominance, the purpose of the inquiry is to determine whether class-wide issues outweigh individual issues. Here, the Court finds that common questions of law and fact predominate over questions affecting only individual members of the Settlement Class. T-Mobile is alleged to have charged the same flat-rate ETF to every member of the ETF-Assessed Class, and all members of the Subscriber Class signed a contract with T-Mobile that contained a flat-rate ETF provision. Nothing in the record exists to indicate that individual issues would predominate at trial.

Additionally, given that the value of an individual claim is no more than a few hundred dollars, maintaining individual actions in this case would be prohibitively expensive, and a class action is therefore the superior method of fairly and adjudicating the controversy. Thus, the Settlement Class satisfies the predominance and superiority requirements of Rule 23(b)(3). Having met the requirements Rules 23(a) and 23(b)(3), the Settlement Class is granted final certification.

### II. Notice

"In the class action context, the district court obtains personal jurisdiction over the absentee class members by providing proper notice of the impending class action and providing

5

the absentees with the opportunity to be heard or the opportunity to exclude themselves from the class." In re Prudential, 148 F.3d 283, 306 (3d Cir. 1998). Under Federal Rule of Civil Procedure 23(c), notice must be disseminated by "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." See also Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 175-76, 94 S. Ct. 2140, 2151-52, 40 L. Ed. 2d 732 (1974)(finding that Rule 23(c) includes an "unambiguous requirement" that "individual notice must be provided to those class members who are identified through reasonable effort").

Additionally, in this case, where a settlement class has been provisionally certified and a proposed settlement preliminarily approved, proper notice must meet the requirements of Federal Rules of Civil Procedure 23(c)(2)(B) and 23(e). Larson v. Sprint Nextel Corp., No. 07-5325, 2009 WL 1228443, at *2 (D.N.J. April 30, 2009)(Linares, J.). 23(c)(2)(B)-compliant notice must inform class members of: (1) the nature of the action; (2) the definition of the class certified; (3) the class claims, issues, or defenses; (4) the class member's right to retain an attorney; (5) the class member's right to exclusion; (6) the time and manner for requesting exclusion; and (7) the binding effect of a class judgment on class members under Rule 23(c)(3). Id.; Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii). Rule 23(e) notice must contain a summary of the litigation sufficient "to apprise parties of the pendency of the settlement proposed and to afford them an opportunity to present their objections." In re Prudential, 177 F.R.D. 216, 231 (D.N.J. 1997).

Class Counsel and T-Mobile disseminated Notice as follows: (1) 1,056,653 postcard notices to individuals who paid a flat-rate ETF between January 1, 2006 and February 19, 2009; (2) postcard notice to 182,037 class members who paid an ETF in 2005; (3) over 6,570,000 bill-stuffer notices to current customers; (4) 468,522 notices to members of the Subscriber Class who

6

were subject to a flat-rate ETF on February 19, 2009; (5) publication notice in eight newspapers for two weeks and additionally in Parade Magazine; and (6) an Internet address (www.ETF-Settlement.com) along with a toll-free phone number that had logged over 56,000 phone calls as of June 27, 2009.  (See generally Docket Entry No. 50-2 (Declaration of Joel K. Botzet ("Botzet Decl.")).)

The Court finds that the parties fully complied with the stringent requirements set forth by Rules 23(c)(2)(B) and 23(e).[2]  The notice plan was robust, thorough, and included all of the essential elements necessary to properly apprise absent Class members of their rights.[3] Additionally, on February 17, 2009, T-Mobile properly gave notice of the pending class settlement to the Attorney General of the United States and the attorneys general of all fifty states, as required by 28 U.S.C. § 1715.  (Docket Entry No.  84 (Decl. of Mark S. Kokanovich) ¶ 2.)

### III.    Final Settlement Approval

Under Rule 23, a court may only approve a class settlement after it has held a hearing and determined that the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  The Third Circuit has enumerated nine factors to be utilized in this determination:

---

[2] This Court previously engaged in a detailed discussion of the notice requirements associated with Rule 23(C)(2)(B) and 23(e).  Larson v. Sprint Nextel Corp., No. 07-5325, 2009 WL 1228443 (D.N.J. April 30, 2009).  That case involved strenuous objections to the notice plan used and implemented by the parties.  Contrary to the Larson matter, however, Class Counsel and T-Mobile have fully satisfied the requirements set forth by Rules 23(c)(2)(b) and 23(e).
[3] Objector Daniel Phee argues that the Notice was inadequate because it failed to include the Plan of Allocation.  (Docket Entry No. 43.)  This Court disagrees.  As an initial matter, the Plan of Allocation was referenced in the Settlement Agreement and made easily accessible to anyone interested in viewing it on the Settlement Website.  More importantly, however, Rule 23(e) does not require that a notice contain every specific detail related to the settlement.  See, e.g., In re Painewebber Ltd. Partnerships Litig., 171 F.R.D. 104, 124 (S.D.N.Y. 1997) ("Nor does the adequacy of notice turn on the ability of an individual Class Member to calculate the amount of his or her actual recovery under the settlement.")  Rather, "...settlement notices need only describe the terms of the settlement generally."  In re Michael Milken and Associates Securities Litig., 150 F.R.D. 57, 60 (S.D.N.Y. 1993) (citations omitted).

> (1) the complexity, expense and likely duration of the litigation;
> (2) the reaction of the class to the settlement; (3) the stage of the
> proceedings and the amount of discovery completed; (4) the risks
> of establishing liability; (5) the risks of establishing damages; (6)
> the risks of maintaining the class action through the trial; (7) the
> ability of the defendants to withstand a greater judgment; (8) the
> range of reasonableness of the settlement fund in light of the best
> possible recovery; (9) the range of reasonableness of the settlement
> fund to a possible recovery in light of all the attendant risks of
> litigation.

Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975). Additionally, a presumption of fairness exists

where a settlement has been negotiated at arm's length, discovery was sufficient, the settlement

proponents are experienced in similar matters, and there are few objectors. In re Warfarin

Antitrust Litig., 391 F.3d 516, 535 (3d Cir. 2004). The presumption of fairness attaches in this

case because the Settling Parties negotiated the settlement before the Honorable Douglas

Wolfson (ret.), pre-settlement discovery in this case and related cases had supplied counsel with

an understanding of the factual and legal issues involved, the attorneys litigating this matter are

experienced in similar litigation, and very few class members have objected. Varacallo v.

Massachusetts Mut. Life Ins. Co., 226 F.R.D. 207, 235 (D.N.J. Feb. 15, 2005) (Linares, J.).

Moreover, "the participation of an independent mediator in settlement negotiations virtually

insures that the negotiations were conducted at arm's length and without collusion between the

parties." Bert v. AK Steel Corp., No. 1:02-CV-467, 2008 WL 4693747 (S.D. Ohio Oct. 23,

2008). Thus, the use of a mediator with respect to the present settlement is persuasive evidence

that the negotiations were hard-fought, arms-length affairs.

Finally, settlement of litigation is generally favored by courts, especially in the class

action setting. "The law favors settlement, particularly in class actions and other complex cases

where substantial judicial resources can be conserved by avoiding formal litigation." In re

General Motors, 55 F.3d 768, 784 (3d Cir. 1995); see also In re Warfarin, 391 F.3d at 535 (there

is an "overriding public interest in settling class action litigation, and it should therefore be

8

encouraged"). At the same time, the district court functions "as a fiduciary who must serve as a guardian of the rights of absent class members" by ensuring that the proposed settlement is fair, reasonable, and adequate. In re General Motors, 55 F.3d at 785.

Turning, therefore, to each of the Girsh factors, the Court finds as follows:

**1.     Complexity, Expense and Likely Duration of the Litigation:** The expense and likely duration of litigation are factors to be considered in evaluating the reasonableness of a proposed class action settlement. In this case, the litigation has the potential to drag on for years. The issues involved are legally and factually complex, and litigation in other courts involving similar issues indicates that this type of case involves significant discovery and expert witness testimony. Importantly, continued prosecution of this case would also require Plaintiff to overcome considerable legal hurdles, including T-Mobile's belief that this matter is subject to arbitration pursuant to the customers' wireless service contracts, the notion that the ETF is preempted by the FCC, and the complexity associated with attempting to certify and maintain a nationwide class. That the parties were able to reach a settlement very early in the litigation weighs in favor of approval, as it saves the time associated with discovery, motions, and eventually trial. Importantly, of course, it also provides the Class with immediate, definite relief. This factor therefore weighs in favor of approval.

**2.     Reaction of the Class to the Settlement:** This second Girsh factor gauges whether members of the class generally support or object to the settlement. In order to properly evaluate it, "the number and vociferousness of the objectors" must be examined. In re General Motors, 55 F.3d at 812. Generally, "silence constitutes tacit consent to the agreement." Id. (quotation omitted). As outlined above, the notice program in place with respect to this settlement was comprehensive, detailed, and robust. Thus, the failure of Class Members to object is certainly a factor that would weigh heavily in support of approval.

9

Here, only 563 individuals opted out of the Class. (Docket Entry No.78 (Supp. Dec. of Joel Botzet) ¶ 11.) Moreover, the Court has received only eight objections to the proposed settlement.[4] Thus, this settlement has strong class support. Of the eight objections, the Court finds that none are meritorious.

        a.      Objectors Carder, Lyons, and Miller ("Carder Objectors"), represented by Stephen Tsai, Esq., argue that they were never charged ETFs but that they were previously prevented from switching carriers because they wanted to avoid being charged an ETF. Thus, they claim that the settlement discriminates against them by not providing them any relief. This argument is factually flawed. If the Carder Objectors are current T-Mobile subscribers, then they are eligible for non-cash benefits in the form of bonus minutes, bonus text messages, or free "T-Mobile HotSpot" access. If, on the other hand, they were never assessed an ETF, never paid an ETF, and subsequently switched carriers, then they would not be members of the Class for purposes of this settlement and would not have standing to object.

        b.      Objector Daniel Phee, represented by Robert Margulies, objects that the settlement agreement discriminates against Class members who were charged an ETF prior to February 19, 2009 but paid it in full after that date. This is incorrect. All Class members who paid an ETF during the Class Period are entitled to $125 compensation. All Class members who were charged, but did not pay, the fee during the Class Period are entitled to $25 compensation. Thus, in either scenario, Objector Phee could recover under this settlement.

        c.      Next, Phee and the Carder Objectors lodge complaints to the claims process, finding it inadequate, time-consuming, and too detailed. Courts have frequently upheld claims forms such as the one utilized in this case, and the Court finds it perfectly appropriate to

---

[4] The following individuals have lodged objections to the settlement – (1) Drew J. Anderssen; (2) Daniel Phee; (3) Michael Van Bemmelen; (4) Aaron Petrus; (5) Stacey Hayes; and (6) Thomas A. Carder, Kimberley Lyons, and Aaron Miller. (Docket Entry Nos. 42, 43, 48, 53, 54, 57.)

require Class members to submit certain information proving that they are entitled to collect the

relief awarded in this case. See, e.g., DeHoyos v. Allstate Corp., 240 F.R.D. 269, 314 (W.D.

Tex. 2007). Moreover, Class Counsel notes that an incomplete claim form will still be reviewed

and considered in full during the claims administration process. (Docket Entry No. 62 at 18 n.

3.) This objection is accordingly overruled.

        d.     Finally, the remainder of objections – by Phee, the Carder Objectors, and

various pro se objectors, do not pertain to the sufficiency of the settlement itself but rather

address other aspects of T-Mobile's business, including its customer service and reports to credit

bureaus. (Docket Entry Nos. 42 and 48.) Because these objections do not cast doubt upon the

reasonableness of the settlement reached in this matter, the Court does not consider them.

      **3.**     **Stage of the Proceedings and Discovery Completed:** While little discovery has

taken place within the confines of this particular action, the parties have each assessed the

settlement value of the case and have examined the strengths and weaknesses of their relative

positions. Additionally, Class Counsel has extensive experience litigating ETF cases, having

filed similar actions against Sprint-Nextel, Verizon, and AT&T. Thus, even though the action

settled at a relatively early stage in the proceedings, the Court finds that counsel on both sides of

the table are experienced and able litigators, and that the parties have sufficiently apprised

themselves of the relevant facts and law to make a knowledgeable decision as to settlement.

This factor weighs in favor of approval.

      **4.**     **Risk of Establishing Liability:** The risks of proceeding to trial in any case are

considerable. In re Prudential, 962 F. Supp. 450, 539 (D.N.J. 1997). This case is no different.

Class Counsel has outlined several risks to establishing liability and damages, including: (i) even

if a court held T-Mobile's liquidated damages clause to be unenforceable, T-Mobile would be

allowed to counter-claim for the actual amount of damages that it could prove at trial; and (ii) T-

Mobile's actual damages could very well exceed the amounts recoverable by the Class.  In that scenario, the Class recovery would be zero.  Additionally, as indicated earlier, T-Mobile retains several potent legal defenses, including arbitration and preemption.  Given the above risks, and noting the inherent difficulty associated with litigating and proving this case at trial, the Court agrees that this <u>Girsh</u> factor weighs in favor of approval.

      **5.**      **Risks of Establishing Damages:** This factor is intertwined with the previous one, and weighs in favor of approval.

      **6.**      **Risks of Maintaining the Class Action Through Trial:** Though several cases have been filed and litigated against T-Mobile, in both state and federal courts, no class has ever been certified in any T-Mobile ETF case.  Certainly, this is strong evidence that real risks exist in obtaining and maintaining class certification through trial.

      Additionally, a substantial risk exists with respect to class actions asserting state-law claims from multiple jurisdictions because under New Jersey's choice of law scheme predomination can be defeated by the finding that each state has the greatest interest in its own law being applied.  <u>Ford Motor Co. Ignition Switch Prods. Liab. Litig.</u>, 174 F.R.D. 332, 351 (D.N.J. Aug. 28, 1997) ("Viewing these variations in the context of a case involving five state-law causes of action, the laws of fifty states, and over twenty-three million plaintiffs, the court must conclude that this suit cannot be practically and efficiently tried as a class action because plaintiffs have not established a predominance of common legal issues as required by Rule 23(b)(3).").  Taken in concert, the fact that no class has yet to be certified in a T-Mobile ETF case coupled with the real legal risks to certification cause this factor to come down in favor of approval.

      **7.**      **Ability of Defendant to Withstand A Greater Judgment:** T-Mobile is a mult-billion dollar company that has given no indication of an inability to pay a greater judgment.

Thus, this factor weighs against settlement.

      **8.     The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and in Light of all the Attendant Risks of Litigation:** Combining the final two Girsh factors, the analysis here compares the reasonableness of the settlement against the risks of litigation and the best possible Class recovery. Class Counsel suggests that a jury would be tasked with properly ascertaining T-Mobile's actual damages in the event that the ETF is found to be an unenforceable penalty. As indicated earlier, a jury could very well find a net recovery in favor of the Class, but it also could find that T-Mobile's damages exceed those of the Class and thereby leave the Class with no recovery. At the end of the day, it is difficult to prognosticate the best possible recovery for this Class but it is clear that $13.5 million along with a move to pro-rated ETFs is a reasonable recovery in light of the risks already highlighted.

      Having evaluated the proposed settlement against the nine Girsh factors and against the dictates of Rules 23(b)(3), 23(c), and 23(e), the Court finds that it warrants approval. The minuscule number of objectors combined with the size of the class recovery, the robust notice program, and the real risks associated with taking this matter to trial all indicate that the settlement ought to be approved. The Court therefore grants the motion for final approval of the settlement reached in this matter.

## IV.     Attorneys' Fees, Incentive Award, and Expenses

      Next, Class Counsel also moves for an award of attorneys' fees in the amount of 33 1/3% of the Settlement and reimbursement of expenses in the amount of $54,530.65. Thirty-three and one-third percent of the $13.5 million settlement ($11.5 million cash and $2 million non-cash) is equal to $4.5 million. While the amount of this award has garnered few objections, its ultimate

distribution remains heavily contested. The "Bursor Group"[5] and the "Plutzik Group"[6] have filed motions for their own share of the expected multi-million dollar fee. (Docket Entry Nos. 65, 66.) Additionally, the Bursor Group and the Plutzik Group have filed a joint motion for appointment of a special master. (Docket Entry No. 72.)

### A.    Application of *Gunter* Factors

The awarding of fees is within the district court's discretion. In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 727 (3d Cir. 2001). However, the court must clearly articulate the reasons supporting its conclusion. In re Rite Aid Corp. Securities Litig., 396 F.3d 294, 301 (3d Cir. 2005). "In a class action settlement, the court must thoroughly analyze an application for attorneys' fees, even where the parties have consented to the fee award." Varacallo, 226 F.R.D. at 248. Generally, a court will use either the percentage-of-recovery method or the lodestar method to determine the fee award. In re GM, 55 F.3d at 821. The lodestar method is considered most appropriate in statutory fee-shifting cases, and has the advantage of resembling a tradition fee calculation, whereas the percentage-of-recovery method is viewed as best approximating a contingent fee award in a common fund recovery. Cendant PRIDES, 243 F.3d at 732. The Third Circuit has approved the use of the percentage-of-recovery method for determining attorneys' fees in common fund cases, such as this one. In re Rite Aid, 396 F.3d at 300.

---

[5] The Bursor Group consists of several sets of lawyers, all of whom represent Class members Gary Hellman, Tamara Ruiz, and Margaret Gripaldi. Hellman, Ruiz, and Gripaldi had filed a motion to intervene, which this Court denied on July 24, 2009. (Docket Entry Nos. 61, 80). The lawyers comprising the Bursor Group are: (1) Lite DePalma Greenberg & Rivas; (2) Faruqi & Faruqi; (3) Jayne E. Goldstein; (4) William Pinilis; (5) Gilman and Pastor; and (6) Scott A. Bursor.

[6] The Plutzik Group consists of: (1) Bramson, Plutzik, Mahler & Birkhaeuser, LLP; (2) Franklin & Franklin; (3) Sherman Business Law; (4) Law Offices of Anthony A. Ferrigno; (5) Reich Radcliffe & Kuttler; (6) Cuneo Gilbert & LaDuca, LLP; (7) Carl Hilliard, Esq.; and (8) Law Offices of Joshua Davis.

The standard for evaluating fee awards is reasonableness. Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983). In common fund cases of the type presented here – where attorneys' fees and the Class recovery come from the same source and the fees are based on a percentage of the Class settlement – the Third Circuit has set forth a multi-factor analysis to help analyze whether or not the percentage award is reasonable. Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n. 1 (3d Cir. 2000). These factors include:

> (1) the size of the fund created and the number of persons benefited; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

Id.; see also In re AT&T Corp., 455 F.3d 160, 165 (3d Cir. 2006). These factors are not intended to be exhaustive. Among other factors that a Court may consider are:

> (1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations; (2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained; and (3) any "innovative" terms of settlement.

AT&T, 455 F.3d at 165-166 (citing In re Prudential Ins. Co. America Sales Practice Litig. Agent Actions, 148 F.3d 283, 338-340 (3d Cir. 1998). The above-referenced factors should not be applied in a formulaic way; rather, the district court should "engage in robust assessments of the fee award reasonableness factors recognizing an especially acute need for judicial scrutiny of fee arrangements in class action settlements." AT&T, 455 F.3d at 166 (citations and quotations omitted); see also Gunter, 223 F.3d at 195 n.1 (finding that "factors listed need not be applied in a formulaic way" and "in certain cases, one factor may outweigh the rest"). Finally, the Third Circuit requires that a district court cross-check the percentage-of-recovery calculation against the lodestar method to ensure that the percentage-of-recovery method has yielded a reasonable

number. AT&T, 455 F.3d at 164.

The Court first evaluates the propriety of the requested fee award through application of the Gunter factors, and then addresses the motions regarding appointment of a special master and allocation of fees. Importantly, the Girsh factors discussed earlier are similar to, and overlap with, several of the Gunter factors. Thus, the Court incorporates by reference the reasons already articulated for approval of the settlement, and now makes specific findings with respect to each of the Gunter factors.

### 1.  Size of Fund Created and Number of Persons Benefitted

The first Gunter factor analyzes the size of the fund created and the number of persons benefited. Gunter, 223 F.3d at 195. n.1. Generally speaking, there is an inverse relationship between an increase in the size of the settlement fund and the percentage fee award. In re Prudential, 148 F.3d at 339. This case, however, involves only a cash fund of $11.5 million and non-cash benefits valued at $2 million. While this is a significant amount given the claims asserted and the risks of establishing liability, the net recovery is not so large as to implicate the "inverse relationship" called for by a "very large" settlement. See In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166, 195 (E.D.Pa 2000) (finding that $100 million is the informal marker constituting a "very large" settlement).

The size of the fund here is large and the size of the Class measures in the millions. As of June 20, 2009, 41,650 claims had been filed. (Docket Entry No. 49 at 3.) Thus, the settlement has afforded benefits to a large amount of people. Additionally, alongside these monetary benefits, T-Mobile also agreed to switch to a pro-rated ETF system and allow any customer who is still subject to a flat-rate ETF to convert his or her contract into a prorated one. Considering the large number of persons benefited and the significant size of the common fund created, this factor weighs in favor of the $4.5 million request for fees.

16

### 2.    Class Member Objections

Next, a Court must examine "the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel." Gunter, 223 F.3d at 195 n.1. Only five Class Members lodged objections to the amount of attorneys' fees requested, and none of those objections state a substantive ground to warrant denying the request.[7] The Court notes that the Bursor and Plutzik Groups have lodged objections to the respective percentage payouts of the total amount of fees, but these objections do not strike at the reasonableness of the fee award itself. This factor, therefore, is strong evidence that the requested fee is reasonable.

### 3.    Skill and Efficiency of the Attorneys Involved

The Court considers the skill and efficiency of Plaintiff's counsel, "as measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." Nichols v. SmithKline Beecham Corp., No. 00-6222, 2005 WL 950616, at *22 (E.D. Pa. April 22, 2005) (quotation omitted). The Court has already found, in its analysis of the Girsh factors, that Class Counsel are experienced and skilled in prosecuting ETF cases specifically and class actions more generally. The recovery achieved here came about quickly and swiftly, and though Class Counsel faced few legal difficulties in this particular case (due to the early settlement), the fact remains that a settlement of this magnitude only occurred because both sides properly recognized the legal and factual risks of going to trial. Finally, T-Mobile was represented by highly-skilled attorneys from two very prominent law firms, both of whom have experience litigating these

---

[7] Objectors Daniel Phee, Stacey Hayes, Thomas A. Carder, Kimberley Lyons and Aaron Miller object to attorneys' fees as excessive. However, none of the objectors states a clear ground upon which to find the fees excessive, relying instead on a general proclamation to that effect. Their objections are accordingly overruled.

types of cases. In re Warner Communications Securities Litig., 618 F. Supp. 735, 749 (S.D.N.Y. 1985) ("The quality of opposing counsel is also important in evaluating the quality of plaintiffs' counsel's work.")  Accordingly, this favor weighs in favor of approving the requested fee award.

### 4.  Complexity, Difficulty, and Duration of the Litigation

With respect to duration, the Court has already noted that this particular matter settled early.  No substantive motions were entertained by the Court, and the matter proceeded rather quickly from an initial complaint filed on August 18, 2008, to preliminary settlement approval on February 19, 2009, to a final approval fairness hearing on July 27, 2009.  Thus, the litigation was not long or drawn out.  The Court, however, is aware that ETF litigation against T-Mobile has been ongoing for several years now – in state and federal court – and the settlement in this case cannot be evaluated simply by looking at the sparse docket referenced above.  As indicated with respect to the third factor, this matter reached settlement because both sides appreciated the difficulties with taking the case to trial.

Next, regarding difficulty and complexity, the legal issues presented were by no means easy to navigate.  The Court has already discussed at length the potential hurdles that would have cropped up had Class Counsel elected to pursue this matter to trial.  Even though this particular litigation was not lengthy, the Court finds that the duration of all of the ETF cases pending against T-Mobile (in state and federal courts) along with the complexity of the legal issues involved weighs in favor of awarding the requested amount of fees.

### 5.  Risk of Nonpayment

Class Counsel submits that it undertook this litigation on a contingent fee basis, with the risk that it might yield little or no recovery and leave them uncompensated for their efforts. Certainly, the risk associated with taking a case on contingency is a real and important factor to consider.

> Counsel's contingent fee risk is an important factor in determining the fee award. Success is never guaranteed and counsel faced serious risks since both trial and judicial review are unpredictable. Counsel advanced all of the costs of litigation, a not insubstantial amount, and bore the additional risk of unsuccessful prosecution.

In re Prudential-Bache Energy Income P'ships Litig., No. 888, 1994 WL 202394, at *6 (E.D. La. May 18, 1994). Indeed, "[t]he contingent fee agreement further substantiates the propriety of the attorneys' fee award." In re Genta Securities Litig., No. 04-2123, 2008 WL 2229843, at *10 (D.N.J. May 28, 2008); see also In re Pet Food Prods. Liab. Litig., No. 07-2867, 2008 WL 4937632, at *22 (D.N.J. Nov. 18, 2008) ("Courts have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees."). The risk of nonpayment here, as with most contingency work, was high.  Given the legal defenses available to T-Mobile and the oft-noted hurdles associated with certifying a class and proving liability, this factor is solidly in favor of approval.

### 6.    Amount of Time Devoted to Case by Plaintiffs' Counsel

Next, the sixth Gunter factor is the "amount of time devoted to the case by plaintiffs' counsel." Gunter, 223 F.3d at 195 n.1.  Class Counsel submits a compendium of fees and expenses totaling 5,586.87 hours, equaling $2,889,634.50 in lodestar and $54,530.65 in expenses.  (Docket Entry No. 64 (Decl. of James E. Cecchi ("Cecchi Decl.")), Exh. A.)  The attorneys comprising this massive hourly bill break down as follows:

| FIRM NAME | HOURS | LODESTAR ($) | EXPENSES ($) |
|---|---|---|---|
| Carella Byrne | 772.40 | 493,828.50 | 3,873.75 |
| Freed & Weiss | 1630.30 | 711,816.00 | 40,572.48 |
| Seeger Weiss | 428.25 | 243,257.50 | 175.61 |
| Lovell Mitchell & Barth | 41.25 | 16,482.50 | 362.70 |

| | | | |
|---|---|---|---|
| Jacqueline Mottek (Coughlin Stoia) (Positive Legal Group) | 2092.75 121.85 | 972,282.50 54,834.00 | 9,346.11 175.00 |
| Strange & Carpenter | 165.72 | 131,972.75 | 0 |
| Augustine & McKenzie | 28.6 | 7,865.00 | 25.00 |
| Richard Burke | 163 | 105,950.00 | 0 |
| Eric Stoppenhagen | 48.75 | 19,256.25 | 0 |
| William Sweetnam | 8.7 | 4,567.50 | 0 |
| Banducci Woodward Schwartzman | 54.6 | 21,294.00 | 0 |
| Wardup & Wardrup | 30.7 | 7,675.99 | 0 |
| Barry L. Kramer | 198 | 143,550.00 | 0 |
| **TOTAL** | 5,586.67 | 2,889,634.50 | 54,530.65 |

(Id.)  Additionally, as noted earlier, two groups of attorneys – the Plutzik Group and the Bursor

Group – have submitted their own respective motions for attorneys' fees.  The Plutzik Group

details the following in time, lodestar, and expenses:

| FIRM NAME | HOURS | LODESTAR ($) | EXPENSES ($) |
|---|---|---|---|
| Bramson Plutzik | 1511.30 | 605,247.00 | 31,162.48 |
| Franklin & Franklin | 943.03 | 490,375.60 | 16,351.49 |
| Anthony A. Ferrigno | 522.3 | 300,322.50 | 6486.46 |
| Reich Radcliffe & Kuttler | 208 | 70,973.75 | 477.15 |
| Carl Hilliard | 108.08 | 70,250.00 | 1102.54 |
| Cuneo, Gilbert & LaDuca | 150.99 | 72,670.00 | 4,161.29 |
| Joshua Davis | 26.275 | 14,451.25 | 0 |

| | | | |
|---|---|---|---|
| **TOTAL** | 3,469.975 | 1,624,290.10 | 59,741.41 |

(See generally Docket Entry No. 60 (Declarations of Counsel in support of Motion for Award of Attorneys' Fees and Expenses).)  And with respect to the same three categories – time, lodestar, and expenses – the Bursor Group reports the following with respect to its concurrent motion for fees:

| FIRM NAME | HOURS | LODESTAR ($) | EXPENSES ($) |
|---|---|---|---|
| Lite DePalma Greenberg & Rivas | 11.8 | 5,107.50 | 0 |
| Faruqi & Faruqi | 1,179.20 | 652,549.50 | 12,287.96 |
| Jayne E. Goldstein | 148 | 51,722.50 | 1511.72 |
| William Pinilis | 5.6 | 2,800 | 0 |
| Gilman and Pastor | 75.4 | 39,585 | 158.75 |
| Scott A. Bursor | 1115.29 | 596,680.15 | 7932.47 |
| **TOTAL** | 2535.29 | 1,348,444.65 | 21,890.90 |

(See generally Docket Entry No. 65 ("Declarations of Counsel submitted in support of joint motion for payment of incentive awards to Hellman et al. and for award of attorney's fees and nontaxable costs to ETF counsel").)

Having evaluated the time summaries provided by the various attorneys identified above, the Court notes its concerns with at least two of Class Counsel's claimed hours, lodestar, and expenses. First, the law firm of Freed & Weiss appears to have logged 1630 hours, equating to a mind-boggling lodestar of over $700,000. The Declaration of Paul M. Weiss in support of this figure is chalk full of question-marks. (Cecchi Decl., Exh. C ("Weiss Decl.").)  He claims to have taken primary responsibility for the uploading and reviewing of over 140,000 documents

21

produced by T-Mobile *after* preliminary approval of the settlement.  (Id. ¶ 20.)  This took place, apparently, in order to "confirm[] the adequacy of the Settlement."  Additionally, Weiss claims time associated with the filing of two other federal ETF-related complaints against T-Mobile: (1) Sweetnam v. T-Mobile USA, Inc., No. 2:06-cv-01463-RSM (W.D. Wash.), filed on October 10, 2006 (hereinafter, "Sweetnam"); (2) Greener, Banducci, Shoemaker, P.A. v. T-Mobile USA, Inc., No. 1:06-cv-00452-EJL (D. Idaho), filed on November 10, 2006 (hereinafter, "Greener"). (Weiss Decl. ¶¶ 13-14.)  However, T-Mobile successfully moved to stay both Sweetnam and Greener.  (Id. ¶ 17.)  A quick peek at the Sweetnam and Greener dockets indicates that nothing has taken place – no discovery, no depositions, no substantive motion practice.  The only major event in either case involved the contested motion to stay.  Finally, Weiss claims to have undertaken "more fact and legal investigation" leading up to the filing of the instant action, adding that he and his firm "spent significant resources over many months working up the case, compiling and analyzing documents, conducting legal and additional fact research."  (Id. ¶ 18.) Certainly, the Court is aware that investigation, research, and analysis goes into drafting a successful complaint.  However, given the timeline of this case and the fact that the other cases mentioned by Weiss appear to have had no major activity, his claim of $700,000 in lodestar is facially untenable.

Additionally, Class Counsel provides the Declaration of Barry L. Kramer.  (Cecchi Decl., Exh. N ("Kramer Decl.").)  That Declaration simply provides a total of 198 hours, equaling a $143,550 lodestar.  Mr. Kramer, however, submits that he "does not keep individual time sheet records because I find these to be highly unproductive for this type of case."  (Id.)  Certainly, Mr. Kramer is entitled to his own method of book-keeping, but this type of Declaration is wholly unhelpful to a Court tasked with determining a proper fee award.  Given its clearly-articulated lack of detail, Kramer's Declaration is of little value in evaluating this Gunter factor.

Having found fault, however, with the Weiss and Kramer Declarations, this factor still supports a fee award in the amount requested. After all, even if Class Counsel's hours were equal to 50% of the amount claimed, they would support recovery of the fee award requested. Moreover, when the Court adds in the hours expended by the Bursor Group and the Plutzik Group, this factor easily moves to the plus side of the ledger.[8] Thus, the Court notes its concerns with two of Class Counsel's submitted declarations but finds this factor still to weigh in support of awarding fees.

### 7.    Awards in Similar Cases

With respect to this final factor, the court must (1) compare the award requested with other awards in comparable settlements; and (2) ensure that the award is consistent with what the attorney would have received had the fee been negotiated on the open market. McGee v. Continental Tire North America, Inc., No. 06-6234, 2009 WL 539893, at *15 (D.N.J. March 4, 2009). As to the first inquiry, "most fees appear to fall in the range of nineteen to forty-five percent." In re Ikon Office Solutions, Inc. Securities Litig., 194 F.R.D. 166, 194 (E.D. Pa. 2000). The Court is aware that 33 1/3% is a standard figure for recovery in a consumer class action of the contingent-fee variety. See, e.g., Martin v. Foster Wheeler Energy Corp., No. 06-878, 2008 WL 906472, at *5 (M.D. Pa. March 31, 2008) (noting that for a settlement of $1.64 million "district courts have typically awarded attorneys' fees of 30% to 35% of the recovery, plus expenses..."); In re Corel Corp. Sec. Litig., 293 F. Supp. 2d 484, 495-98 (E.D. Pa. 2003) (awarding one-third of $7 million settlement fund). In this case, where the settlement fund is substantially larger than both $1.64 million and $7 million, the 33 1/3% number is certainly justified.

---

[8] As noted in Section IV.C.3, infra, the Court approves fees to the Bursor Group and the Plutzik Group for work they performed on behalf of the California state class prior to appointment of Class Counsel in the instant matter. Thus, it is appropriate to include their hours in the overall assessment of this Gunter factor.

Next, the requested fee of 33 1/3% is also consistent with a privately negotiated contingent fee in the marketplace. "Attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class commercial litigation." Id. at *16 (quoting In re Remeron Direct Purchaser Antitrust Litig., No. 03-085, 2005 WL 3008808, at *16 (D.N.J. Nov. 9, 2005) (citation omitted); see also In re Orthopedic Bone Screws Products Liability Litig., 2000 WL 1622741, at *7 (E.D. Pa. Oct. 23, 2000) (... the court notes that plaintiffs' counsel in private contingency fee cases regularly negotiate agreements providing for thirty to forty percent of any recovery.") Thus, the requested fee award is strongly supported by both subparts to this final Gunter factor.

### 8.    Conclusion

Application of the Gunter factors confirms the reasonableness of Class Counsel's requested 33 1/3% fee award. All seven of the Gunter factors, to varying degrees, militate in favor of approving this fee. The lack of any notable objections along with the complexity of the case, the substantial settlement, the contingency risk associated with nonpayment, and the fact that several courts in similar matters have awarded fees in this amount all indicate that approval of a 33 1/3 % fee is warranted.

### B.    Lodestar Cross-Check

In common-fund cases, district courts are also advised to cross-check the percentage fee award against the lodestar method of awarding fees so as to ensure that the percentage is not unreasonable. Gunter, 223, F.3d at 199. "The lodestar cross-check, while useful, should not displace a district court's primary reliance on the percentage-of-recovery method." AT&T, 455 F.3d at 164. The lodestar multiplier is calculated by dividing the attorneys' fees that Class Counsel seeks by Class Counsel's associated lodestar. Cullen v. Whitman Medical Corp., 197 F.R.D. 136 n.6 (E.D. Pa. 2000).

As indicated above, the total time claimed by Class Counsel is 5586.67 hours, for a lodestar of $2,889,634.50.[9] Using that figure, the lodestar multiplier would be 1.55. However, as noted above, the Court takes issue with the Weiss and Kramer Declarations and accordingly – for purposes of the lodestar cross-check – the Court deducts their corresponding lodestars from Class Counsel's final figure. Deducting Weiss's lodestar of $711,816 and Kramer's lodestar of $143,550 yields a lodestar for Class Counsel of $2,034,268.50 and a multiplier of 2.21. The Third Circuit has noted that "[m]ultiples ranging from one to four are frequently awarded in common fund cases where the lodestar method is applied." In re Prudential, 148 F.3d at 341. In fact, in Cendant PRIDES, the Third Circuit approved a lodestar multiplier of 2.99 in a case it described as "relatively simple in terms of proof" in which "discovery was virtually nonexistent." Cendant PRIDES, 243 F.3d at 735-36; see also AT&T, 455 F.3d at 173 (discussing the reasonableness of the Cendant PRIDES multiplier). Thus, a 2.21 multiplier is well within the range of reasonableness.

Next, as set forth in Section IV.C.3, infra, however, the Court is awarding fees to the Bursor and Plutzik Groups for their work on behalf of the California state class of T-Mobile subscribers. Thus, is it appropriate to consider their hours in the lodestar multiplier calculation. Adding in the Bursor Group's lodestar of $1,348,444.65 and the Plutzik Group's lodestar of $1,624,290.10, the new lodestar is $5,007,003.25 (this does not include the Weiss and Kramer hours) and the new multiplier is .90. Thus, considering all of the pertinent hours spent litigating ETF cases against T-Mobile nationwide, this attorney fee award does not cover the entire

---

[9] The lodestar is calculated by multiplying an attorney's reasonable rate, as measured by the prevailing market rates in the community multiplied by the reasonable hours expended. Loughner v. Univ. of Pittsburgh, 260 F.3d 173, 180 (3d Cir. 2001). In this case, twelve separate attorneys from different regions comprise Class Counsel's fee application. The Court has not conducted its own inquiry into the market rates in each of those communities but is satisfied based upon the declarations received that the various rates charged are reasonable. Additionally, the Court notes that all parties have appropriately broken down their lodestar by rates charged depending on the particular position of the attorney or paralegal involved.

lodestar. A multiplier of less than one is quite reasonable for a lodestar cross-check.

Finally, the Court reiterates that "this is only a cross-check and a not a full lodestar analysis." In re Linerboard Antitrust Litig., No. MDL 1261, 2004 WL 1221350, at *15 (E.D. Pa. June 2, 2004). To delve deeply into the thousands of hours claimed by the many attorneys involved in this matter would undermine the Court's reliance on the percentage-of-recovery method. Thus, while this Court has raised questions as to the veracity of some of the hours claimed within Class Counsel's fee petition, the fact of the matter is that the hours claimed by all parties to ETF litigation against T-Mobile more than satisfy the lodestar cross-check for percentage-of-recovery purposes.[10] Thus, though some of the hours are questionable, the cross-check fully supports a $4.5 million fee award. Accordingly, the Court finds that the lodestar cross-check confirms the reasonableness of a $4.5 million fee.

### C.    Allocation of $4.5 Million Fee

Of course, awarding a $4.5 million fee does not end the matter. Rather, while objections to the reasonableness of the settlement and to the reasonableness of the total fee award have been few and far between, the parties have saved their ammunition to wage this particular battle. Specifically, Class Counsel, the Plutzik Group, and the Bursor Group vociferously disagree on how the $4.5 million fee should be allocated. This Court first provides factual background to the dispute, then outlines the applicable law, finally issues its decision.

### 1.    Facts

The Plutzik and Bursor Groups rely heavily on the work they performed in two state-court actions to substantiate their claim for attorneys' fees arising out of the instant settlement. Indeed, the Settlement Agreement in this matter serves to release claims that have been waged in state and federal courts by various sets of attorneys for the past several years. The Bursor and

---

[10] In fact, even if Class Counsel's lodestar came in at half the claimed amount ($1.4 million instead of $2.8 million) the multiplier would be an acceptable 3.2.

Plutzik Groups claim, however, that the specific successes achieved in their dual state-court matters were so important to the present settlement that they deserve the lion's share of fees. Before addressing this argument on the merits, the Court provides a brief overview of the two state-court actions litigated by the Bursor and Plutzik Groups.[11]

The Bursor Group and the Plutzik Group were counsel to Plaintiffs in two state cases: (1) Hellman v. T-Mobile USA, Inc., Case No. 502004CA005061MB (Circuit Ct of 15th Judicial Circ., Palm Beach Cty, FL.) (hereinafter, "Hellman"); and (2) Vaughan, et al. v. T-Mobile USA, Inc., Case No. RG03108118 (part of In re Cellphone Termination Fee Cases, JCCP 4332 (Calif. Superior Ct., Alameda Cty, CA) (hereinafter, "Vaughan"). The Vaughan action is part of a consolidated proceeding involving ETF claims against several wireless-service providers. Both Vaughan and Hellman are identified as Related Actions in Article II.35 of the Milliron Settlement Agreement. Thus, the Settlement Agreement will settle and release the claims pending in both cases.

Within the confines of the Vaughan case, the Bursor and Plutzik Groups successfully fought off at least two T-Mobile defenses. First, T-Mobile raised the defense of federal preemption. Eventually, on March 15, 2005, the Cellular Telephone & Internet Association ("CTIA") – a trade group that includes Verizon, Spring, AT&T, and T-Mobile, filed a "Petition for an Expedited Declaratory Ruling" finding that ETFs are "rates charged" within the meaning of Section 332(c)(3)(A) of the Communications Act and FCC precedent and that any application of state law by a court to invalidate ETFs would be preempted by Section 332(c)(3)(A). (Bursor Decl. ¶ 56.) The Bursor Group claims to have "participated extensively" in the FCC proceedings, including drafting and submitting "to the FCC of formal comments, reply

---

[11] The Court's discussion of the Hellman and Vaughan cases, litigated by the Bursor and Plutzik Groups (among others) is generally drawn from the Bursor and Plutzik Declarations submitted in support of their respective motions for attorneys' fees. (Docket Nos. 60-2 ("Plutzik Decl.") and 65-8 ("Bursor Decl.").

comments, and numerous ex parte filings advocating against federal preemption of the claims that are the subject of this settlement." (Id. ¶ 58.) The CTIA withdrew its petition in mid-June 2009. (Plutzik Decl. 7.)

Next, T-Mobile moved to compel arbitration. (Bursor Decl. ¶ 19.) Judge Ronald Sabraw denied that motion at the trial court level, a decision eventually upheld by California's intermediate appellate court. T-Mobile's subsequent petitions for review in the California Supreme Court and the United States Supreme Court were denied. (Id. ¶¶ 20-22.)

Hellman, filed on May 17, 2004, also incurred some motion practice. (Id. ¶¶ 30-42.) T-Mobile removed the case to federal court and moved to compel arbitration. (Id. ¶¶ 31-32.) Plaintiffs successfully moved to remand the case to Palm Beach County. (Id. ¶ 36.) With respect to the motion to compel arbitration, the parties agreed in November 2005 to defer further work on the matter pending resolution of similar issues pending in California in the Vaughan matter. (Id. ¶ 41.)

Meanwhile, the Bursor and Plutzik Groups achieved class certification in California in similar ETF-cases against Sprint, AT&T and Cingular. (Plutzik Decl. ¶¶ 19-20.) The hearing on the class certification motion against T-Mobile was stayed once the present settlement achieved preliminary approval. (Id. ¶ 20.) Additionally, the cases against Sprint and Verizon went to trial. (Id. ¶ 23.) The Verizon case settled for $21 million. (Id. ¶ 25.) And in the Sprint case, the plaintiffs received a ruling that flat-rate ETFs were illegal and void under California law. (Id. ¶ 23.) The Plutzik Group takes the position that T-Mobile only settled the present matter because of several factors, all discussed above: (1) preliminary approval of the Verizon settlement; (2) the trial verdict against Sprint; (3) the filing of the class certification motions against T-Mobile; and (4) the achievement of favorable class certification rulings against other wireless carriers. (Id. ¶ 27.)

Finally, the Court notes that according to both the Bursor and Plutzik Groups, T-Mobile did engage in settlement negotiations with <u>Vaughan</u> counsel.  Plaintiffs offered to settle for $49 million, T-Mobile countered with $5 million, and Plaintiffs lowered their demand to $40 million. (<u>Id.</u> ¶ 28.)  T-Mobile never responded to the $40 million offer, eventually settling the matter in this Court with Class Counsel for $13.5 million (cash plus non-cash).

Based upon the events outlined above, the Plutzik Group asserts a lodestar of over $1.6 million and the Bursor Group asserts a lodestar of approximately $1.34 million.  The Plutzik Group does not explicitly argue for a specific percentage breakdown of fees, arguing instead that the Court should either award fees on a "fairness" principle or send the entire dispute to a special master.  The Bursor Group asserts a claim to 40% of the $4.5 million fee award.[12]

### 2.   Law

Generally, appointed Class Counsel is tasked with the responsibility of allocating the aggregate fee award to the various non-lead counsel who played a role in producing the settlement.  The "submission of a combined fee application with actual allocation to be made by lead counsel has generally been adopted by the courts."  <u>In re Linerboard</u>, 2004 WL 1221350, at *17.  "From the standpoint of judicial economy, leaving allocation to such counsel makes sense because it relieves the Court of the 'difficult task of assessing counsel's relative contributions.'"  <u>Id.</u> (quoting <u>In re Prudential</u>, 148 F.3d at 329 n.96.)  Indeed, this general method of allocating fees is embedded in the Settlement Agreement, which provides as follows:

> Class Counsel may make a Fee and Cost Application to be heard at the Final Approval Hearing seeking an award of reasonable attorneys' fees in an amount not to exceed four million, five-hundred thousand dollars ($4,500,000) and reimbursement of expenses.  T-Mobile will not oppose or undermine an application at or below that amount or solicit others to do so.  Attorneys' fees and

---

[12] The 40% figure is contained within a side agreement reached between T-Mobile and the Bursor Group ("Bursor Agreement").  In the Bursor Agreement, the Bursor Group agreed to pursue 40% of the fees awarded in this case, and T-Mobile agreed not to oppose this application. (Bursor Decl., Exh. 7 ("Bursor Agreement") ¶ 5.)

costs consistent with this paragraph that are approved by this Court shall be paid by the Settlement Administrator out of the Common Fund to Class Counsel within fifteen (15) days after the date that the Court has entered the Final Approval Order and Judgment. Class Counsel shall be solely responsible for further distributing, to ETF Counsel and otherwise, any payments made under this provision. No later than twenty-one (21) days prior to the Final Approval Hearing, ETF Counsel shall submit to Class Counsel a summary of the attorneys' fees they wish to seek as part of the Settlement. All other claims for attorneys' fees by ETF Counsel shall be deemed waived. In no event will any attorneys' fees be required to be paid other than from the Common Fund, and in no event will awarded attorneys' fees exceed four million, five-hundred thousand dollars ($4,500,000).

(Settlement Agreement, Art. VI ¶ 3.)

However, the fees sought by the Bursor and Plutzik Groups are for work performed prior

to the appointment of Class Counsel. According to the Third Circuit, "the court's involvement in

the fee decision will be at its height when the fee request is for work performed before the

appointment of the lead plaintiff." In re Cendant Corp. Securities Litig., 404 F.3d 173, 195 (3d

Cir. 2005). Expanding upon this idea, the Cendant Court discussed the types of work that would

be compensable prior to appointment of a lead plaintiff.

Only those attorneys who confer an independent benefit upon the class will merit compensation. To summarize, responsibility for determining fees for the work of non-lead counsel performed before the appointment of the lead plaintiff will rest, in the first instance, with the district court, though that court may ask the lead plaintiff for guidance in evaluating claims for fees. Only work that actually confers a benefit on the class will be compensable; in the ordinary case, simply filing a complaint that is substantially identical to other complaints will not by itself warrant compensation.

Id. at 197.[13] The Advisory Committee Notes to the 2003 Amendments to Rule 23(h) support the

Cendant court's conclusions, stating as follows:

[Rule 23(h)] provides a format for all awards of attorney fees and nontaxable costs in connection with a class action, not only the award to class counsel. In some situations, there may be a basis for making an award to other counsel whose work produced a beneficial result for the class, such as attorneys who acted for the class before certification but were not appointed class counsel, or attorneys

---

[13] The Cendant Court discussed fees in the context of the Private Securities Litigation Reform Act ("PSLRA"). Though this is not a PSLRA case, the Court finds that the analysis of pre-appointment attorneys' fees is applicable.

who represented objectors to a proposed settlement under Rule 23(e) or to the fee motion of class counsel.  Other situations in which fee awards are authorized by law or by agreement of the parties may exist.

Fed. R. Civ. P. 23(h), Advisory Committee Notes to the 2003 Amendments.

Thus, both the Bursor and Plutzik Groups, as well as Class Counsel, are correct.  Class Counsel is generally permitted to allocate a fee award to the non-lead counsel who produced work on behalf of the settlement.  This procedure conserves judicial resources and leaves the allocation decision in the hands of counsel who are best-equipped to evaluate the relative contributions of various attorneys to the ultimately successful outcome.  The Court, therefore, gives Class Counsel's fee determination significant deference.  However, the Court is tasked with the duty of analyzing and assessing the contributions of non-Class Counsel that occurred prior to appointment of Class Counsel.  This Court, therefore, strikes a middle ground – it will evaluate and ultimately decide the percentage award to be given to the Bursor and Plutzik Groups for pre-appointment work while allowing Class Counsel to divide the remainder of the fee based upon the relative contribution of each attorney.

### 3.    Application

The Court agrees that the Third Circuit's decision in Cendant authorizes an award of fees for work performed prior to the appointment of Class Counsel that conferred an independent benefit on the Class.  However, the positions advanced by the Bursor and Plutzik Groups with respect to this issue are far too aggressive.  Under their base argument, they are entitled to a significant percentage of the $4.5 million attorney fee because they achieved several successful results litigated the Vaughan and Hellman cases, all of which theoretically led T-Mobile to settle its claims in the instant action.  The significant percentage they assert a claim to is nearly 80% of awarded fees.  When asked at the fairness hearing what would constitute a "fair" allocation of fees would be, Mr. Bursor responded – "I think it would be fair, your Honor, to give my group

31

40 [percent], the California group 40 [percent], and to give these folks [Class Counsel] 20."

(Fairness Hr'g Tr. Jul 27, 2009 48:22-24). Later, Mr. Bursor suggested that even this breakdown

was too generous to Class Counsel, stating:

> …you know, I am not sure that Mr. Cecchi's group actually added any value to
> the settlement. If we were going to do a fee paid based on the value obtained for
> the class, I am not sure they would get anything. So when I say I think it would
> be fair [to give] 40 to my group, 40 to the California folks and 20 to them, I think
> that actually overcompensates them in terms of value generated for the class.

(Id. at 50:10-18.) The argument advanced by the Bursor and Plutzik Groups, in favor of an 80%

allocation of the $4.5 million fee award, is simply not supported by the law. More importantly, it

would yield consequences that would wreak havoc on the practice of class action litigation.

The logical import of Bursor's and Plutzik's argument is that their victories in the

Vaughan matter, coupled with the positive results achieved against *other* wireless-service

providers (Sprint, Verizon, and AT&T) entitle them to a fee in any action settled anywhere that

addresses ETF claims against T-Mobile. The settlement Class in this case is nationwide and

includes the California class proposed in the Vaughan matter. But Bursor and Plutzik do not

simply espouse a theory in which they are entitled to recover for ETF claims settled as to the

class on whose behalf they have litigated for the past five years – the state court class in

California. Rather, if some different set of attorneys began and settled a state-court action, on

behalf of a statewide class, in a state other than California, the Bursor and Plutzik Groups would

claim an entitlement to fees, so long as the action addressed ETFs charged by T-Mobile. This

argument is as aggressive as it is untenable – if upheld, it would allow lawyers to successfully

litigate one state-court case and thereby put a stake in the ground with respect to fees collected

on similar claims in different jurisdictions.[14] The fact that they successfully defeated T-Mobile's

---

[14] The Court uses the term "successfully litigate" loosely, as the Bursor and Plutzik Groups rely
not on a successful trial court verdict or settlement, i.e., the successful conclusion to a case, but
rather on an assorted set of motion practice victories.

motion to compel arbitration, successfully litigated cases against *other* wireless carriers in California, and poured many hours of work into opposing the wireless industry's claims of federal preemption does not entitle them to fees in all actions that settle ETF claims against T-Mobile. And if Bursor and Plutzik would not be entitled to automatically claim fees in a separate state-court action that settled after the victories described in Vaughan and Hellman, they certainly are not entitled to 80% of fees in a nationwide class such as Milliron.

In fact, adopting the Bursor and Plutzik Groups' position in this case would ostensibly allow them to prevent attorneys from filing related actions in different jurisdictions altogether. The plaintiffs in Vaughan, after successfully defeating T-Mobile's motion to compel arbitration, and after putting work into litigating T-Mobile's preemption defense, would assert a claim to fees in all actions filed against T-Mobile involving ETFs. If one catalyst for class action litigation is the possibility that an attorney can collect an attorney fee award that offsets the risk associated with taking a case on contingency, Bursor and Plutzik's claim to 80% of any fee awarded would dis-incentivize any new lawyers from bringing suit. In the end, T-Mobile would be forced to settle with the Bursor and Plutzik Groups or not settle at all.

The real disservice occurring from this chain of events is borne out by the very settlement in this case. The Bursor and Plutzik Groups, by their own declarations, advised this Court that they first offered $49 million and then $40 million to settle the Vaughan matter on a nationwide basis with T-Mobile. The matter settled for $13.5 million with Class Counsel in the instant case. Yet, neither Bursor nor Plutzik object to the reasonableness of the settlement reached in this matter. This is in spite of the fact that during the Fairness Hearing and on the papers, much appeared to be made of the fact that Class Counsel had settled this case "on the cheap" by swooping in and consummating a settlement at a fraction of the $40 million. (Fairness Hr'g Tr. July 27, 2009 49:2-5) (Bursor: "Well, they [Class Counsel] didn't actually get the case settled,

your Honor. They came in and made a settlement offer that was about 25 percent of what we were demanding after we litigated the case for five years.") In their papers to Judge Winifred Smith, the presiding judge in the <u>Vaughan</u> matter, the Bursor and Plutzik Groups opposed T-Mobile's application for a stay (due to the <u>Milliron</u> settlement) on the ground that "the Milliron settlement is the product of a reverse-auction and not fair or adequate to the members of the class in <u>Vaughan v. T-Mobile</u>." (Bursor Decl., Exh. 6 at 2.) According to Judge Smith, Plaintiffs also argued to her that the lawyers in the <u>Milliron</u> matter had not undertaken the necessary investigation and discovery to properly settle the claims and that the settlement might well be unreasonable. (<u>Id.</u> at 3.) After all of this posturing, however, no member of the Plutzik or Bursor Groups objected to the settlement in this matter. In other words, forty-million dollars might have been their starting offer in the California negotiations with T-Mobile but both Plutzik and Bursor agree that $13.5 million is fair and reasonable. Yet under their theory of fee allocation, Defendant would never have been able to negotiate with outside counsel to get to $13.5 million because Bursor and Plutzik might well have prevented those additional filings in the first place.[15]

In fact, at some level, the claim asserted by the Bursor and Plutzik Groups is even more aggressive than the simple argument seeking to parlay victories against T-Mobile into fees in related litigation. Rather, part of their application is also based on the fact that they settled a similar case against <u>Verizon</u>, litigated to verdict a case against <u>Sprint</u>, and successfully certified classes in cases against other wireless-service providers. In other words, they seek to use assorted successes in separate cases *against different defendants* to stake their claim to fees in

---

[15] This, of course, begs the question – if $13.5 million is reasonable and the Bursor and Plutzik Groups could not get a settlement done because they came in too high at $40 million, how does that impact this Court's evaluation of the value of their California work to the nationwide settlement reached in this matter? Beginning settlement negotiations at an astronomically high starting point does not necessarily entitle an attorney to fees if someone else puts in the time to negotiate the settlement for a reasonable number.

this one. Thus, the successful settlement in <u>Verizon</u>, if it contributed at all to T-Mobile's desire to settle its own suit, would entitle the <u>Verizon</u> lawyers to fees. No Court has held for this proposition and for good reason.

Finally, the Court takes issue with even the "simple" argument that successes in <u>Vaughan</u> were of such extraordinary significance that they forced T-Mobile to settle this action. Certainly, this Court does not deny that the plaintiffs in <u>Vaughan</u> litigated their case well and won a significant victory by defeating T-Mobile's motion to compel arbitration. However, that victory does not in and of itself collaterally estop T-Mobile from moving to compel arbitration in this or other jurisdictions. <u>See, e.g.</u>, <u>In re Jamster Marketing Litig.</u>, MDL No. 1751, 2008 WL 4858506 (C.D. Cal. Nov. 10, 2008) (disallowing collateral estoppel argument where Court had previously denied T-Mobile's motion to compel arbitration because the new motion to compel arbitration involved issues arising under the laws of states other than California); <u>Hall v. AT&T Mobility LLC</u>, 608 F. Supp. 2d 592, 600 (D.N.J. 2009) (Linares, J.) (discussing the application of non-mutual offensive collateral estoppel to defendant's motion to compel arbitration). In fact, T-Mobile brought its own motion to compel arbitration in this action, choosing to withdraw it only after the case had settled. (Docket Entry No. 9.) Additionally, the heavy emphasis that the Bursor and Plutzik Groups place upon their roles in opposing T-Mobile's preemption argument belies the actual timing of the FCC proceedings. Plutzik concedes that the FTIA petition was not withdrawn until mid-June 2009, well after preliminary approval of the present settlement. The fact that the issue was addressed and litigated at various FCC hearings does not mean that, at the time of the filing of the Complaint in <u>Milliron</u> or at the time of preliminary approval of the present settlement, the Bursor and Plutzik Groups had successfully fought off the preemption argument on behalf of all members of the nationwide class. Rather, evaluating the strength of its preemption argument along with the strength of its motion to compel arbitration, and taking into

account the potential for an eventual verdict at trial, T-Mobile made the decision to settle.  All in all, the work done in California certainly played a role in bringing T-Mobile to the settlement table, just as any victories against a defendant might cause it to re-think its litigation strategy with respect to similar claims in different jurisdictions.  The current state of class action law, however, does not permit the Bursor and Plutzik Groups to recover 80% of fees based upon a successfully litigated motion to compel arbitration and hundreds of hours spent litigating an issue of preemption.  Nor does it permit recovery for successes attained in other cases against other defendants.

At the end of the day, results matter.  Class Counsel, having settled this case for a value that even the Bursor and Plutzik Groups concede is reasonable, is entitled to reap the benefits.  Bursor and Plutzik, having achieved significant victories in California, should receive compensation for their tremendous amount of work undertaken litigating the state-court claims in Vaughan.  That work entitles them to a share of fees based upon the class that they actually represented – a class that begins and ends with California T-Mobile subscribers.  Awarding a limited fee, based upon pre-appointment work performed on behalf of the state-court class that they actually represented, allows the Bursor and Plutzik Groups to protect their investment in the California state class while preserving the vitality of the class-action mechanism that allows other attorneys to assert and litigate similar claims on behalf of new classes in other states.

In conclusion, the Plutzik and Bursor Groups are not entitled to 80% of fees of a nationwide settlement that they agree is fair and reasonable on the simple ground that they successfully defeated multiple motions by T-Mobile in a related state-court action.  Their successes in Vaughan are certainly worth compensating, however, because they directly benefited the California class of T-Mobile subscribers.  Class Counsel suggested in their papers and at oral argument that 16% of the T-Mobile nationwide class resides in California and that

16% would therefore be an appropriate number upon which to base the Bursor/Plutzik compensation request. (Class Counsel Opp. Br. to California ETF Fee Applications at 5.) The 16% number has gone unchallenged. Thus, this Court relies upon it and agrees with Class Counsel as to its significance. The attorneys who litigated the Vaughan matter are entitled to 16% of the $4.5 million fee awarded in this action, resulting in an award of $720,000.

The Court notes that the California group litigating the Vaughan matter consisted of the Bursor Group, Plutzik Group, and Jacqueline Mottek. Ms. Mottek has joined forced with Class Counsel in the present case and submitted her fee request as part of Class Counsel's overall fee petition. As already noted, the Bursor and Plutzik Groups submitted their applications for fees separately from Class Counsel, requesting reimbursement for value generated prior to appointment of Class Counsel. The Court has now awarded $720,000 to the attorneys who litigated the Vaughan matter. The total hours billed by each of the three groups is 8219.87, broken down as follows: (1) Jacqueline Mottek – 2214.60 hours; (2) Plutzik Group – 3,469.98 hours; (3) Bursor Group – 2535.29 hours. Thus, the percentage of the $720,000 allocable to each party is 27% ($194,400) to Mottek, 42.2% ($302,400) to the Plutzik Group, and 31% ($223,300) to the Bursor Group. Though Ms. Mottek has put in her claim for fees alongside Class Counsel, the Court awards her the $194,400 identified above for her work on behalf of the California state class prior to settlement of the present matter. Class Counsel is certainly entitled to give her additional compensation for her contributions towards creating the present Milliron settlement.

Finally, neither the Plutzik nor Bursor Groups are entitled to any percentage of the $4.5 million award based upon their work in Hellman. The Bursor Declaration clearly notes that Hellman has been stayed since 2005 pending resolution of the Vaughan matter. Thus, it would be a stretch for this Court to find that the work in Hellman contributed to the settlement reached on behalf of Florida consumers. Otherwise, Plutzik and Bursor would be able to file actions in

several different states, stay those actions pending the outcome of the largest one, and then claim

fees on behalf of all actions no matter who settled them or how they were settled.  For good

reason, no case stands for this radical proposition.

At the end of the day, the California litigation significantly advanced claims on behalf of

the California class.  This Court, therefore, agrees that the work is compensable to the tune of

$720,000, equal to 16% of $4.5 million.[16]

### C.   Expenses

Finally, Class Counsel requests $54,530.65 in out-of-pocket litigation expenses.

Expenses are recovered if they are adequately documented and reasonable in nature.  In re Safety

Components, Inc. Sec. Litig., 166 F. Supp. 2d 72, 108 (D.N.J. 2001)("Counsel for a class action

is entitled to reimbursement of expenses that were adequately documented and reasonably and

appropriately incurred in the prosecution of the class action.") (citing Abrams v. Lightolier, Inc.,

50 F.3d 1204, 1225 (3d Cir. 1995)).  Courts have generally approved expenses arising from

photocopying, use of the telephone and fax, postage, witness fees, and hiring of consultants.

Abrams, 50 F.3d at 1225; Cullen, 197 F.R.D. at 151.

Having found the Weiss Declaration facially untenable, the Court strikes his associated

$40,572.48 request for expenses.  The questions arising from his Declaration call into question

---

[16] As noted earlier, the Bursor Group also signed a side Agreement with T-Mobile agreeing to
apply for a 40% cut of the fee award.  In that Agreement, the Bursor Group agreed to "continue
to assist T-Mobile in reviewing the notice program for this litigation."  (Bursor Agreement ¶ 2.)
The Bursor Group is not an objector to this litigation, and therefore is not covered by the general
rule in which courts can award attorneys' fees to objectors for work that substantially increased
the value of the settlement.  In re Rent-Way Securities Litig., 305 F. Supp. 2d 491, 520 (W.D.
Pa. 2003) ("Absent a showing that the objector substantially enhanced the benefits to the class
under the settlement, the objector is not entitled to a fee.")  In any case, even if that rule applied,
no showing has been made that the Bursor Group performed any such work.  Rather, because the
Bursor Agreement implicated post-Settlement work, it inevitably comes within the confines of
Class Counsel's decision regarding the adequate distribution of fees.  Class Counsel is fully able
to judge and appreciate the merits of each attorney's contribution to the settlement after the filing
of the Complaint in this matter, and therefore the Court shall not award separate fees to the
Bursor Group based on any supposed contributions it made to the notice program in this matter.

the veracity of the entire request and therefore the Court cannot grant his request for over

$40,000 in expenses. The rest of Class Counsel's expenses, in the amount of $13,958.17, are

approved. Additionally, the Bursor and Plutzik Groups shall be reimbursed for their expenses, in

the amount of $59,741.41 for the Plutzik Group and $21,980.90 for the Bursor Group.

### **D.** **Incentive Awards**

In accordance with Paragraph VI.4 of the Settlement Agreement, the Court approves a

$1,000 incentive award for plaintiff Milliron to be paid out of the common fund.

### **E.** **Motion for Special Master**

The Bursor and Plutzik Groups have also moved this Court to appoint a special master to

oversee the present fee dispute. The issue of fee allocation has now been decided, and thus this

request is denied as moot.

Importantly, however, the premise underlying this motion is false. The Bursor and

Plutzik Groups argue for submission to a special master because they believe that someone

should evaluate the hours submitted. This presumes that fees should be allocated on the basis of

hours billed. As the Court has already indicated, that presumption is mistaken. The Plutzik and

Bursor Groups are not entitled to recover for their full lodestar in litigating the California action,

nor are they entitled to receive a percentage of the fee award based upon their lodestar as

compared with that of Class Counsel. Rather, they are entitled to recover for their contributions

to the present settlement on behalf of the California class of T-Mobile subscribers. Accordingly,

the Court need not sift through reams of time entries, nor need it appoint a special master to do

so. Allocating proceeds based upon the size of the California class vis-à-vis the total T-Mobile

set of subscribers is a fair and reasonable way to apportion fees for value added prior to

appointment of Class Counsel.

### **V.** **Conclusion**

For the reasons set forth above, the Court finds that the Settlement in this matter is fair, reasonable, and adequate and provides a significant recovery to the Class. Additionally, the request for attorneys' fees in the amount of $4.5 million is approved, as is the request for expenses and an incentive award. Finally, the Court awards a portion of the $4.5 million to the Bursor and Plutzik Groups but denies their request for 80% of fees.

**THEREFORE, IT IS on this 10th day of September, 2009,**

**ORDERED** that the proposed settlement Class, consisting of the ETF-Assessed Class and the Subscriber Class, is certified pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3); and it is further

**ORDERED** that final approval is hereby granted to the Settlement Agreement that was preliminarily approved on February 19, 2009, as the settlement is fair and reasonable and sat satisfies the multi-factor balancing test laid out by *Girsh v. Jepson*, 521 F.3d 153, 157 (3d Cir. 1975); and it is further

**ORDERED** that the motion by Class Counsel for an award of attorneys' fees in the amount of $4.5 million is **GRANTED**; and it is further

**ORDERED** that the request for expenses in the amount of $13,958.17 for Class Counsel, $59,741.41 for the Plutzik Group, and $21,890.90 for the Bursor Group is **GRANTED;** and it is further

**ORDERED** that the the Plutzik Group's and Bursor Group's dual motions for attorneys' fees and costs (Docket Entry Nos. 65 and 66) are **GRANTED IN PART and DENIED IN PART**; and it is further

**ORDERED** that the Plutzik Group is awarded $223,300, the Bursor Group is awarded $302,400, and Jacqueline Mottek is awarded $194,400 of the $4.5 million fee award, for work performed on behalf of the California state class prior to appointment of Class Counsel in the

present matter; and it is further

    **ORDERED** that Class Counsel is vested with the discretion to distribute the remainder of the fee award to those attorneys who assisted in creation of the present settlement fund; and it is further

    **ORDERED** that Plaintiff Milliron shall receive an incentive award of one-thousand dollars; and it is further

    **ORDERED** that the motion for appointment of a special master is **DENIED** (Docket No. 72); and it is further

    **ORDERED** that Class Counsel and T-Mobile shall implement the Settlement Agreement in accordance with its terms and with the holdings set forth in this Opinion and Order; and it is further

    **ORDERED** that the file in this matter is hereby closed.


**Jose L. Linares**
**UNITED STATES DISTRICT JUDGE**